## In re RITE AID CORPORATION SECURITIES LITIGATION.

**Laborers Local 1298 Annuity Fund, derivatively and on behalf of Rite Aid Corporation.**

v.

**Alex Grass, et al.**

**Nos. 1360, 99–2493, Civ.A. 99–2493.**

United States District Court, E.D. Pennsylvania.

April 17, 2001.

650

Harvey Greenfield, Law Firm of Harvey Greenfield, New York City, for In re Rite Aid Corporation, Derivative Litigation.

Samuel P. Sporn, Christopher Lometti, Jay P. Saltzman, Joel P. Laitman, Schoengold & Sporn, P.C., New York City, for Laborers Local 1298 Annuity Fund, Derivatively and on behalf of Rite Aid Corporation.

Alan J. Davi, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, David R. Fine, Kirkpatrick and Lockhart, Harrisburg, PA, Richard J. Morvillo, Ivan B. Knauer, Kirkpatrick & Lockhardt, Washington, DC, for Alex Grass.

Alan J. Davis, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, Andrew B. Weissman, Wilmer, Cutler & Pickering, Washington, DC, James J. Rodgers, Dilworth, Paxson, LLP, Philadelphia, PA, William H. Jeffress, The Warner, Washington, DC, for Martin L. Grass.

Steven J. Rothchild, Paul J. Lockwood, Laura S. Clare, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, for Philip Neivert.

Stephen M. Greenberg, Joel M. Silverstein, Herbert Stern, Stern and Greenberg, Roseland, NJ, for Franklin C. Brown.

David M. Howard, Dechert, Price and Rhoads, Philadelphia, PA, Catherine Botticelli, Wallace l. Timmeny, Dechert Price & Rhoads, Washington, DC, for Timothy J. Noonan.

Steven J. Rothschild, Paul J. Lockwood, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, for Leonard I. Green and Nancy A. Lieberman.

John E. Caruso, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Richard L. Klein, Willkie, Farr & Gallagher, New York City, Joseph T. Baio, Tariz Mundiya, John R. Oller, Allison J. Ross, Rachel J. Fremmer, Willkie Farr & Gallagher, New York City, Michael R. Young, Willkie Farr & Gallagher, New York City, for KPMG, LLP.

## MEMORANDUM

DALZELL, District Judge.

Five weeks after learning of a partial class action settlement that did not include them, the former Chief Executive and Chief Financial Officers of Rite Aid Corporation filed a motion to disqualify the law firm of Ballard Spahr Andrews & Ingersoll. Ballard Spahr had, from late March of 1999 until the fall of that year, represented all defendants in what is now the consolidated multi-district litigation involving alleged violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, in the purchase and sale of Rite Aid securities.

After extensive briefing on the instant motion, we also received objections from, among others, Martin L. Grass (the former CEO) and Frank Bergonzi (the former CFO) to the terms of the partial settlement itself.[1] Their objections are, in part, based on the motion to disqualify and argue in that regard that the settlement is the fruit of a tree poisoned by the allegedly unethical participation of Ballard Spahr in its negotiation and consummation.

After we concluded the April 6, 2001 fairness hearing on the class action and derivative settlements, we on April 11 and 12 heard testimony in connection with the motion to disqualify.[2] After Bergonzi's counsel expressed his Fifth Amendment concerns about being subjected to questioning on the motion, he elected to withdraw his motion with prejudice, which we allowed by Order of April 11, 2001. Grass, on the other hand, expressed no such concerns, and presses his motion to disqualify, which we decide here.

*Factual Background* [3]

When Rite Aid on March 12, 1999 publicly announced disappointing earnings results, the market immediately punished its stock price for it. In the first day of trading after the announcement, according to the pleadings, Rite Aid lost $14.44 from its prior closing price of $37, for a loss in market capitalization on that day of about $3.7 billion. As is the custom in such matters, these events triggered litigation the next day, March 16. Most of the putative class action suits were filed in this district, and eventually those cases and litigation from outside this district were consolidated in the pending multi-district litigation.

On the filing of the first suits, Elliot S. Gerson, Senior Executive Vice–President and General Counsel of Rite Aid, after consulting with Franklin Brown, Vice–Chairman of Rite Aid, retained Alan Davis, Esquire, of Ballard Spahr to represent Rite Aid and Grass, who was at the time the only senior officer of Rite Aid named in the litigation. Gerson had known Davis since 1984, when both practiced law at the Philadelphia firm of Wolf, Block, Schorr & Solis–Cohen. We credit Gerson's testimony that, after conferring with Grass and Bergonzi, he concluded that all defendants in the putative class action had an identity of interest because the allegations were, in Gerson's view, without merit, and thus one firm could represent all defendants.

Davis memorialized the representation in a March 24, 1999 engagement letter which began by thanking Gerson "for engaging this firm to represent the interests of Rite Aid Corporation and Martin L. Grass in the defense of the putative class actions that have been filed against Rite Aid and Mr. Grass following the Company's March 12, 1999 earnings announcement," Ex. A, Mem. of Rite Aid Corp. in Opp'n to Mot. to Disqualify Counsel (Decl. of Alan Davis, Esq.) (hereinafter "Decl. of Alan Davis") at Ex. 1. Of great pertinence to the pending motion, on page 2 of his March 24 engagement letter, Davis advised Gerson that:

At the present time, we do not see any conflict that would prevent the firm

---

1. Grass and Bergonzi filed their objections jointly, as they did the instant motion.

2. Specifically, we heard testimony from defendant Grass, Elliot Gerson, Esquire (Senior Executive Vice–President and General Counsel of Rite Aid), and Alan Davis, Esquire (a Ballard Spahr partner and outside counsel for Rite Aid).

3. The following constitute our findings of fact upon the record adduced on April 11 and 12. We received the witnesses' written declarations as their direct testimony, and all except Bergonzi were subjected to extensive examination.

from representing both the Corporation and Mr. Grass. It is possible, however, that such a conflict may arise or become apparent in the future, in which case it is understood that Mr. Grass would retain separate counsel and that the firm would continue to represent the Corporation.

It is undisputed that at the time Gerson retained Davis to represent Rite Aid and Grass, Gerson had also retained the Washington, D.C. firm of Wilmer Cutler & Pickering to represent Grass personally. Gerson had engaged Wilmer Cutler for Grass after the *Wall Street Journal* had in January of 1999 published an exposé regarding related-party transactions involving Rite Aid that allegedly benefitted Grass and the Grass family. The Wilmer Cutler partners who represented Grass were William McLucas and Harry Weiss, Esqs.

In his testimony before us, Grass testified that he could not recall ever seeing an engagement letter either from Wilmer Cutler or Ballard Spahr. Grass also acknowledged in his testimony that he looked to Gerson to help him retain outside counsel in such matters.

Shortly after Davis sent Gerson the March 24, 1999 engagement letter, additional putative class action complaints were filed. The first derivative action was filed on May 14, 1999. These new suits also named Frank Bergonzi, the former Chief Financial Officer, and Timothy Noonan, then Rite Aid's President and Chief Operating Officer. Gerson requested that Ballard Spahr represent these new defendants on the same terms as the original representation of the corporation and Grass. Thus, on March 26, 1999, Ballard Spahr entered its appearance for Rite Aid and Messrs. Grass, Bergonzi and Noonan.

After we held a motions hearing on June 2, 1999, the plaintiffs on July 14 filed what they styled a "Corrected Consolidated Amended Class Action Complaint". Pursuant to our Order, Ballard Spahr filed a motion to dismiss that complaint on behalf of all defendants on September 1, 1999.

Events at Rite Aid took a sudden turn the following month. On October 11, 1999, Rite Aid announced that its 1997, 1998 and 1999 financial statements would have to be restated, resulting later that month in ·a $500 million reduction of Rite Aid's previously represented pre-tax earnings. On October 15, 1999, at a particularly dramatic meeting of the Rite Aid Finance Committee at the New York City office of Skadden, Arps, Martin Grass silently resigned his position as Chairman and Chief Executive Officer of Rite Aid, an event that was publicly announced on October 19, 1999. This resignation was sufficiently unpleasant that Grass was given no compensation or retirement benefits upon his resignation and none·have been paid to him since.[4] By contrast, when Bergonzi was earlier forced to step down as Chief Financial Officer, he received the lavish severance agreement that we received as Exhibit R–6 which provided, *inter alia,* for compensation of $525,000 per year through 2002.

As a result of these developments, the Audit Committee of Rite Aid's Board of Directors began an internal investigation and obtained its own outside law counsel and other professionals, including, most notably, the Ten Eyck forensic accounting firm. This Committee has, since that time, worked cooperatively with the Securities and Exchange Commission which is investigating possible violations of the federal securities laws, and with the United States Attorney's Office for the Middle

---

4. Though Rite Aid has paid Grass no compensation, it has advanced his legal fees to date for his three law firms.

District of Pennsylvania, which apparently is investigating possible criminal wrongdoing.

Although Davis had followed these dramatic developments in the public press, it was not until October 29, 1999 that he had a meeting at his firm with Gerson and Mr. Ten Eyck, the forensic accountant the Audit Committee had retained. Davis then for the first time learned of facts suggesting that Messrs. Grass and Bergonzi had engaged in conduct which appeared to constitute serious breaches of their fiduciary duties to Rite Aid, both before and after commencement of the shareholder litigation, but had concealed those breaches from Rite Aid and Ballard Spahr. Consequently, Davis advised Gerson that he and his firm could no longer represent Grass and Bergonzi, and that they should be instructed to retain their own counsel.

On that day, Davis's partner, William A. Slaughter, Esq., called William McLucas of Wilmer Cutler to advise McLucas that a conflict had arisen and thus Ballard Spahr could no longer represent Grass. After trying without success to reach Bergonzi through Gerson, Davis himself on November 12, 1999 explained to Bergonzi that because of the conflict that had developed he could no longer represent Bergonzi "and that it was imperative that he replace us with his own personal counsel," Decl. of Alan Davis ¶ 16. Shortly thereafter, Bergonzi retained O'Melveny & Myers. Ultimately, Wilmer Cutler retained Dilworth Paxson, LLP as local counsel for Grass and O'Melveny retained Duane Morris & Heckscher for the same purpose for Bergonzi.

From October 29, 1999, when Ballard Spahr advised Wilmer Cutler of its conflict as to Grass, until the filing of Grass's motion to disqualify on December 15, 2000, Grass took no exception to Davis and Ballard Spahr's continued participation as Rite Aid's counsel in this multi-district litigation. For example, at a pretrial hearing on February 14, 2000, where Grass's personal counsel both appeared,[5] no objection was voiced to Davis's continued and highly visible representation of Rite Aid.

The claimed trigger for this disqualification motion was, as noted at the outset of this Memorandum, the Memorandum of Understanding between the class and derivative plaintiffs and all defendants except Grass, Bergonzi, Noonan and KPMG (Rite Aid's former outside auditors).[6] As to this settlement, it is undisputed that on

---

**5.** Specifically, Andrew B. Weissman, Esq. of Wilmer, Cutler and James J. Rodgers, Esq. of Dilworth Paxson appeared on behalf of Grass. Michael M. Baylson, Esq., formerly United States Attorney for this district, and then (as now) of Duane, Morris, appeared for Bergonzi. Interestingly, when Davis and Slaughter signed the top of the sign-in sheet, they identified themselves as "[r]epresenting Rite Aid Corp." Rodgers and Weissman separately signed in immediately below Davis and Slaughter, and each identified themselves as "[r]epresenting Martin Grass". During that hearing, which was on the subject of the plaintiffs' request for an extension of time for filing an amended complaint, Weissman spoke on the record, acknowledging that he was appearing for Grass and consenting to the extension. Counsel's statements during that hearing also showed that while the lawyers for Rite Aid and the plaintiff class had conferred prior to the hearing on the subject of an extension, Grass's counsel was not part of those discussions.

**6.** Although we will canvass the issue of waiver at greater length *infra*, it is useful here to note that the issue of factual adversity between Grass and Rite Aid—and *when* that adversity ripened—is not a close one. In his testimony before us, Gerson described the vivid details of how it was that Grass abruptly ended his career as head of a multi-billion dollar business. At the October 15, 1999 meeting in a conference room at the New York City office of Skadden, Arps, most, if not all, of the Rite Aid directors were present. The issue under intense discussion was amending Rite Aid's credit facility with a con-

April 10, 2000, the new management of Rite Aid, through Gerson, instructed Ballard Spahr to attempt to settle the shareholder litigation. As a result, on April 20, 2000, Slaughter and Davis met with Sherrie Savett and David Bershad, co-lead counsel for the shareholder class. At that meeting, plaintiffs' counsel made clear that a condition of any settlement with Rite Aid would be that plaintiffs preserve their rights against KPMG and Grass, and in a later meeting plaintiffs' counsel also insisted that Messrs. Bergonzi and Noonan be excluded from any settlement, because they, along with Grass, constituted senior management during the period of the alleged fraud. As noted earlier, these negotiations ultimately bore fruit in the November 8, 2000 Memorandum of Understanding.

It is also important to understand that Grass in his testimony no longer claims—as his lawyers without qualification did on his behalf before the hearing—that he ever conveyed *any* confidential information to Davis or anyone else at Ballard Spahr. Although Grass stated that he participated in two brief telephone conversations involving, among others, himself, Gerson, and Davis, we credit Davis's testimony that it "would very much stand out in my mind if I spoke with the CEO" of such an important company as Rite Aid, but he did not have such a conversation, however brief. To the contrary, we credit Davis's testimony that Gerson instructed him *not* to speak with Grass and, indeed, Davis "never spoke to any defendants I represented"; instead, Davis worked through Gerson. Davis's understanding was that he should speak with Harry Weiss of Wilmer Cutler if he wanted to talk about Grass, and we credit Davis's testimony that he at all times spoke with partners at Wilmer Cutler and never with Grass.

*Legal Analysis*

A. *Disqualification of Ballard Spahr Pursuant to Pa. R.P.C. 1.9*

Federal courts have the inherent power to supervise the conduct of attorneys practicing before them. *E.g., Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F.Supp. 1200, 1203 (E.D.Pa.1992) (citing *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 161 (3d Cir.1984)); *see also* Local R.Civ.P. 83.6 (providing, *inter alia*, that practice before courts of this district are governed by the Pennsylvania Rules of Professional Conduct). In this regard, we have the power to disqualify counsel appearing before us, *e.g., United*

sortium of banks headed by J.P. Morgan. When one of the directors suggested that Rite Aid could pledge its stock in the recently-acquired PCS as collateral, Gerson stated that it had already been pledged on September 24, 1999 when Rite Aid secured $800 million to obtain a short-term credit from the same consortium to pay off commercial paper in that amount that was maturing on September 27. Director Leonard Stern, apparently shocked at this disclosure, incredulously asked, "On whose authority was this stock pledged?" According to Gerson, Grass responded by leaving the conference room "with his tail between his legs". As noted earlier, Grass's resignation was formally announced on October 19.

Grass's interests and Rite Aid's became adverse when Grass silently skulked out of the Skadden, Arps conference room. Unlike Bergonzi's rich severance package, Grass left with nothing. His reported *ultra vires* pledge on September 24 constituted an apparent non-disclosure of double significance at the heart of this litigation, being of obvious Rule 10b–5 significance and of palpable materiality in the pending derivative litigation. From the moment Grass left that conference room, therefore, there was actual, real-world adversity between him and Rite Aid.

It is also important to note that this adversity deepened shortly after October 15, 1999, when it became apparent that Grass would not supply the full, unconditional and voluntary cooperation that Rite Aid requested of all former employees with each of the three pending investigations.

*States v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980) (discussing standards for attorney disqualification) [7]. The party seeking disqualification bears the burden to show that the representation is impermissible, *e.g., James v. Teleflex, Inc.,* No. 97–1206, 1999 WL 98559 at *3 (E.D.Pa. Feb. 24, 1999) (so holding in the context of Rules 1.7 and 1.9), though doubts with respect to violations of the rules of professional conduct should generally be resolved in favor of disqualification, *Int'l Bus. Mach., Corp. v. Levin,* 579 F.2d 271, 283 (3d Cir.1978); *see also Brennan v. Independence Blue Cross,* 949 F.Supp. 305, 307 (E.D.Pa.1996) (citing *Levin* ).

■ In seeking to disqualify Ballard Spahr, Grass relies on Pennsylvania Rule of Professional Conduct 1.9(a) [8], which provides that:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation.

Grass contends that the case against Ballard Spahr here is straightforward. Ballard Spahr, who previously represented Grass in this litigation, has now, by virtue of its representation of Rite Aid in the negotiation of the partial settlement, taken a position adverse to him, and Ballard Spahr did not obtain his consent for such representation. Consequently, he argues, Ballard Spahr has clearly violated Rule 1.9(a) and should be disqualified.

■ This contention notwithstanding, upon a close examination of the circumstances surrounding Ballard Spahr's representation of Rite Aid and Grass [9], we conclude that Ballard Spahr did not engage in unethical or inappropriate conduct with respect to Grass and that disqualification is therefore not warranted. To begin, we observe that courts have found unobjectionable attorney behavior similar to Ballard Spahr's here. Two cases Rite Aid cites in this regard are illustrative, *Allegaert v. Perot,* 565 F.2d 246 (2d Cir.1977) and *Kempner v. Oppenheimer & Co.,* 662 F.Supp. 1271 (S.D.N.Y.1987).

Winthrop Allegaert was a bankruptcy trustee for a Wall Street brokerage, duPont Walston, Inc. ("duPont Walston") [10].

**7.** Even if a court finds that a violation of the rules has occurred, the question of whether disqualification is an appropriate sanction is resolved through a balancing of the various competing interests, *In re Corn Derivatives Antitrust Litig.,* 748 F.2d at 162, *Int'l Longshoremen's Ass'n Local Union 1332 v. Int'l Longshoremen's Ass'n,* 909 F.Supp. 287, 293 (E.D.Pa.1995) (examining *In re Corn Derivatives* and extracting a list of factors for assessing disqualification). As will be seen below, however, we need not reach this question here.

**8.** In his pleadings Grass argued that Rule 1.9(b), which concerns an attorney's use of "information relating to the representation" of a former client in ways adverse to that former client, also serves as grounds for disqualification here. However, during exami-

nation at the hearing, Grass testified that he never gave anyone at Ballard Spahr any information he considered confidential, and also that all of Grass's alleged communications with Davis were in the presence of Gerson, Rite Aid's general counsel (though, as noted above, we credit Davis's testimony that direct conversations did not in fact occur). In the face of this testimony, Grass withdrew his claims under Rule 1.9(b), but maintains that disqualification is nonetheless warranted under Rule 1.9(a).

**9.** Naturally, assessment of attorney conduct with respect to ethical standards is inherently an intensely fact-based inquiry.

**10.** These facts are taken from the discussion at 565 F.2d at 248–50.

Entities controlled by H. Ross Perot owned a second Wall Street brokerage, duPont Glore Forgan ("duPont Glore"), which was failing. Perot arranged a joint venture realignment between duPont Walston and duPont Glore. After this joint venture, duPont Walston went bankrupt. Allegaert, as trustee, asserted various allegations against Perot, essentially claiming that Perot had crammed the joint venture through duPont Walston's board and that Perot had, for example, caused duPont Walston to pay out monies to satisfy duPont Glore's debts, thereby constituting a preference and defrauding duPont Walston's creditors. Even before this suit—but, importantly, after the execution of the joint venture that had mingled duPont Walston's and duPont Glore's operations—one Nella Walston had filed a derivative action on duPont Walston's behalf against Perot and duPont Glore.

Allegaert sought to disqualify two firms, Weil, Gotshal & Manges ("Weil Gotshal") and Leva, Hawes, Symington, Martin & Oppenheimer ("Leva Hawes") from representing Perot. Allegaert contended that these two firms had represented duPont Walston in the derivative suit that Nella Walston filed; in particular, he claimed that both firms had billed duPont Walston for services and that Leva Hawes was on retainer to duPont Walston at the time the derivative action was filed. The two law firms argued, *inter alia*, that although they billed and were in fact paid by duPont Walston, the fees were actually incurred because of their representation of duPont Glore, an arrangement the joint venture allowed. Thus, the firms contended that all their actual work in the derivative case was done on behalf of duPont Glore, in connection with the joint venture. There was no dispute that the derivative litigation was related to the current litigation against Perot.[11]

On these facts, in an analysis under Canon 4 of the Code of Professional Responsibility, the *Allegaert* panel found that disqualification was not warranted. The panel first found that to demonstrate a breach of Canon 4, "it must be shown that the attorney was in a position where he *could* have received information which his former client might reasonably have assumed the attorney would withhold from his present client," 565 F.2d at 250. The panel went on to observe that duPont Walston knew that any information given to the two law firms would be shared with their "primary client", duPont Glore, because of the relationship between duPont Walston and duPont Glore established by the joint venture, and the panel noted that duPont Walston had its own counsel (Shearman & Sterling) for the entire period in question, 565 F.2d at 250. The panel also distinguished earlier cases on the basis that "the attorneys sought to be disqualified here have not changed sides from a former client to a current, adverse client," 565 F.2d at 251.

In *Kempner v. Oppenheimer*, which was also decided under Canon 4, the court accepted the *Allegaert* panel's finding that simultaneous representation may negate disqualification where the party seeking disqualification had no reason *ab initio* to believe that any information would be withheld from the other client. *Kempner* considered a motion by two individual co-defendants to disqualify the firm of Gold, Farrell & Marks ("Gold Farrell") as coun-

---

**11.** Apparently, the firms had also performed work unrelated to the derivative suit for duPont Walston, but the parties differed on whether this work was related to the action against Perot. The *Allegaert* panel declined to resolve this dispute, finding that it did not need to do so given its agreement with the lower court's holding that the absence of any expectation that counsel would keep information of duPont Walston confidential from duPont Glore mooted the question of whether the matters were substantially related.

sel for Oppenheimer & Co., Inc. ("Oppenheimer"), a defendant brokerage house.[12] Kempner sued Oppenheimer and two of Oppenheimer's brokers, alleging unauthorized trading in an account that the two individual defendants had managed. Initially, Oppenheimer retained Gold Farrell to represent both the brokerage and the individual defendants, after the individual defendants had represented to the brokerage that the suit was frivolous. Eight months after the suit was filed, after Oppenheimer uncovered evidence that the individual defendants had engaged in forgery,[13] Gold Farrell withdrew as counsel for the individual defendants, and the plaintiff and one of the individual defendants subsequently sought to disqualify Gold Farrell as counsel for Oppenheimer. The court denied the motion to disqualify, noting that "When Oppenheimer offered to represent both itself and its now former employees in this action, Oppenheimer had no expectation that [the two former brokers'] interests would become adverse, as [the brokers] had represented the matter as a frivolous stock fraud claim," 662 F.Supp. at 1278. In this regard, the court noted that it was the clients, and not counsel, who had changed sides, 662 F.Supp. at 1278.

■ As can readily be seen from the facts outlined above, our circumstances

here match those faced in *Allegaert* and *Kempner.* Rite Aid, through Gerson, retained Ballard Spahr to represent both the corporation and Grass in the class action suit[14], an action that Gerson took on the basis of Grass and Bergonzi's representations that the claims in the suit were meritless. In the language of *Allegaert,* Rite Aid was clearly the "primary" client here. This is particularly so since on the facts of this case it could not be clearer that Ballard Spahr's representation of Grass was *through* Rite Aid: Rite Aid engaged Ballard Spahr on Grass's behalf, and such minimal communications as may have occurred between Grass and Ballard Spahr (we have found there were no direct communications) were all done through or in the presence of Rite Aid's general counsel, Gerson. Moreover, just as in *Allegaert* and *Kempner,* we do not here face a situation where Ballard Spahr dropped Grass in order to switch sides in the litigation and represent a more favored client[15]; as in *Kempner,* the apparent change in position was Grass's, and not Ballard Spahr's.

Grass argues that cases such as *Allegaert* and *Kempner* are inapposite to the instant motion because they were decided under Canon 4, rather than under Rule 1.9. Grass observes that Canon 4 was only concerned with the disclosure of confidential information, and not does not include, as Rule 1.9(a) does, a duty of loyalty independent of any information disclosure.[16]

**12.** These facts are taken from the discussion at 662 F.Supp. at 1274–76.

**13.** In fact, one of the individual defendants, Lovasz, had contacted plaintiff's counsel and had made a statement implicating the other individual co-defendant. Subsequently, Lovasz repeated those allegations to both Gold Farrell and Oppenheimer's inside counsel.

**14.** And also in the later-filed derivative action.

**15.** This has been referred to as the "hot potato" doctrine, under which it is impermissible for counsel to drop a client "like a hot potato" in order to represent a more remunerative or favored client, e.g., *Santacroce v. Neff*, 134

F.Supp.2d 366, 367 (D.N.J.2001). As stated in the text, we cannot see how these concerns are implicated here, where Ballard Spahr had from the outset represented Rite Aid. We also note in this regard that since Rite Aid was and is paying the costs of Grass's defense, there would appear to be little basis for any contention that Ballard Spahr dropped Grass in order to continue a more lucrative representation.

**16.** Our Court of Appeals discussed this duty in *In re Corn Derivatives*. It there noted that "[t]he duty of loyalty does not always detach when the representation ends. A client has an expectation that the attorney will diligently

■ We do not agree that the import of cases like *Allegaert* and *Kempner* is so limited. Though it is certainly true that these cases explicitly examined only Canon 4, and not the later-developed Rule 1.9, the facts of these cases show that Ballard Spahr's actions in this case were in keeping with regular practices of the legal profession, and this informs our assessment of them under Rule 1.9(a).[17] Moreover, we observe that district courts assessing disqualification motions under Rule 1.9 have referred to *Allegaert* and similar cases as guides in applying Rule 1.9(a), *e.g. Host Marriott Corp. v. Fast Food Operators, Inc.*, 891 F.Supp. 1002, 1007 (D.N.J.1995); *Bagdan v. Beck*, 140 F.R.D. 660, 668 (D.N.J.1991); *Zimmerman v. Duggan*, 81 B.R. 296, 300 (E.D.Pa.1987). We also observe that *Allegaert*'s discussion of a "primary" client relationship implicitly involves an assessment of where counsel's loyalty should lie, *see also Zimmerman*, 81 B.R. at 300 (noting that counsel owed a "primary duty of loyalty" to one client with respect to Rule 1.9(a)).[18]

We are fortified in this conclusion by the fact that the authors of the recent *Restatement* similarly find unobjectionable attorney conduct like Ballard Spahr's. Section 132 of the *Restatement (Third) of the Law Governing Lawyers* (2000) provides:

Unless both the affected present and former clients consent to the representation under the limitations and conditions provided in § 122, a lawyer who has represented a client in a matter may not thereafter represent another client in the same or a substantially related matter in which the interests of the former client are materially adverse. The current matter is substantially related to the earlier matter if:

(1) The current matter involves the work the lawyer performed for the former client; or

(2) there is a substantial risk that representation of the present client will involve the use of information acquired in the course of representing the former client, unless that information has become generally known.

Comment (i) to that section notes that, with the informed consent of both clients, a lawyer might undertake representation of another client as an accommodation to the lawyer's regular client. "If adverse interests later develop between the clients, even if the adversity relates to the matter involved in the common representation, circumstances might warrant the inference that the 'accommodation' client understood and impliedly consented to the lawyer's

pursue his goals until the matter is completely resolved, absent an effective waiver. In litigation, an attorney may not abandon his client and take a [*sic*] adverse position in the same case. This is not merely a matter of revealing or using the client's confidences and secrets, but of a duty of continuing loyalty to the client," *In re Corn Derivatives*, 748 F.2d at 161. As we discuss, the particulars of this case show that Ballard Spahr did not so "abandon" Grass, nor did it violate any duty of loyalty that it may have owed him.

17. This is particularly so since one of the purposes of Rule 1.9 is to "maintain[ ] public confidence in the integrity of the bar", *Zimmerman v. Duggan*, 81 B.R. 296, 299 (E.D.Pa. 1987). To the extent Ballard Spahr's actions

demonstrate behavior in accordance with professional norms, then, they are certainly less subject to objection under Rule 1.9.

18. Grass also contends that *Allegaert* and similar cases are not apposite because these cases focused on the question of whether representation was in a "substantially related" matter, while here the representation was in the very same case. We first observe that *Kempner* did in fact involve representation in the same case. More than this, though, as discussed above in the text, *Allegaert* and *Kempner* serve to demonstrate the general propriety of Ballard Spahr's conduct, and, particularly since they were decided before Rule 1.9 was drafted, their holdings cannot be expected to map directly to that Rule's language.

continuing to represent the regular client in the matter." *Restatement (Third) of the Law Governing Lawyers* § 132 cmt (i).

Our circumstances here are analogous to those presented in the *Restatement*'s Comment. Given that Grass through Gerson "engaged" Ballard Spahr as his counsel, and that Grass dealt with Ballard Spahr purely through the corporation, we find that, in the terms of the Comment, Grass is an "accommodation client", and we infer that he had consented to Ballard Spahr's subsequent continued representation of Rite Aid after it had ceased representing him because of potential conflicts. Ballard Spahr's conduct was thus exactly of a sort the *Restatement* authors countenanced, a further demonstration that finding a violation of Rule 1.9(a) in this situation is unwarranted.

■ Moreover, leaving aside the *Restatement*'s "accommodation client" reasoning, the facts here also demonstrate that Grass effectively consented to Ballard Spahr's continued representation of Rite Aid. The engagement letter sent from Ballard Spahr to Rite Aid, as quoted above, could not have been clearer with respect to the relationship between Ballard Spahr's representation of Rite Aid and its

representation of Grass. The letter made it pellucid that Ballard Spahr would, in the event of a conflict between Rite Aid and Grass, cease to represent Grass but continue to represent Rite Aid. Though Grass contends that he never saw this letter, nor agreed to this provision, we find that his decision to engage counsel through Rite Aid bound him to the provisions of the letter, since he was, as Rite Aid's Chief Executive Officer, constructively on notice of the letter's contents.[19] Grass thus consented to the representation, and Ballard Spahr's subsequent continued representation of Rite Aid was not in violation of Rule 1.9.[20]

### B. *Grass and Bergonzi's Waiver of Their Rule 1.9 Objection*

■ Notwithstanding all of the above, Rite Aid also argues that Grass has in any event waived his right to object to Ballard Spahr's continued representation of Rite Aid because of his delay in raising the objection. "Waiver is a valid basis for the denial of a motion to disqualify," *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F.Supp. 1200, 1208 (E.D.Pa.1992), and "[i]n determining whether the moving party has waived its right to object to the opposing party's counsel the court should

19. That is, this would be a different case if Grass had separately contacted Ballard Spahr to retain them as his counsel, and Ballard Spahr had confirmed this separately-arranged representation through the letter to Rite Aid's general counsel. But that is not this case. Here, Grass left the question of his representation in this matter (and others) in the hands of the corporation, in the person of Gerson. Thus, when the corporation was informed of the terms of the representation, Grass was bound to them. We further note in this regard that Grass was at all times also represented by Wilmer Cutler, with whom he could have consulted at any time. Indeed, since October 29, 1999, Grass has also had the services of Dilworth Paxson and Baker Botts LLP, the latter apparently representing Grass's interests in the criminal investigation.

20. Also with respect to the question of whether Ballard Spahr's representation of Rite Aid violated Rule 1.9, we note that Rite Aid argues that the current representation is not adverse to Grass since the proposed partial settlements do not in fact place him in a worse position (with respect to the litigation) than he occupied previously. We do not find this argument convincing. The circumstances now are that Rite Aid is in favor of the settlements, while Grass opposes them; this being so, it does not seem relevant whether Grass has *correctly* assessed the impact of the settlements, but rather only whether he and Rite Aid are taking contrary positions with respect to them.

consider the length of the delay in bringing a motion to disqualify, when the movant learned of the conflict, whether the movant was represented by counsel during the delay, why the delay occurred, and whether disqualification would result in prejudice to the nonmoving party," *Graphix Hot Line*, 808 F.Supp. at 1208.

On the facts of this case, we have no trouble concluding that Grass did indeed waive his objection to Ballard Spahr's continued representation of Rite Aid. We first observe that Grass was represented by Wilmer Cutler and Dilworth Paxson from, at the very latest, February 14, 2000, and therefore the delay in filing the motion was, at a minimum, nine months.[21] Moreover, as discussed in the margin, Grass was represented by highly sophisticated counsel for that entire period.

As to the question of when Grass discovered that Rite Aid's interests were in con-flict with his own, Grass contends that he was ignorant of any such conflict until November 9, 2000, when he first learned of the proposed partial settlements. We cannot accept this as reasonable (much less credible), as the circumstances unambiguously demonstrated Rite Aid's adversity to him well before that date.[22] To begin, the circumstances of Grass's departure from Rite Aid—which amounted to, at best, a pressured resignation without any provision of a severance package[23]—demonstrate the existence, even then, of adversity between Grass and the corporation. Moreover, as Rite Aid, with the aid of outside counsel[24], conducted, after his departure, an internal investigation into perceived financial irregularities; Grass denied the investigators' request for an in-person interview, instead supplying them with a sixteen-page letter.[25] Further, in late 1999

**21.** While James J. Rodgers, Esq., of Dilworth Paxson entered his appearance for Grass on March 8, 2000, the same date on which Andrew B. Weissman, Esq., of Wilmer Cutler applied for admission *pro hac vice*, we observe that, as noted in the margin above, both of these men had effectively entered their appearance on February 14, 2000 by virtue of their participation on Grass's behalf at a hearing before this Court. To the extent that there is any question as to whether Ballard Spahr had withdrawn its appearance—and Grass's counsel suggested at the hearing that it had failed formally to docket such a withdrawal—counsels' statements at the February 14, 2000 hearing effectively amounted to Ballard Spahr's withdrawal and new counsels' appearance. More than this, however, we observe, on the basis of the evidence given in the declarations and at the hearing, that Grass was already represented by Wilmer Cutler at the outset of this case, based upon their engagement to represent him in a matter beginning in January 1999. Even if such representation could not be imputed to this matter, the fact that Wilmer Cutler represented to Ballard Spahr in November 1999 that Wilmer Cutler would be succeeding Ballard Spahr as counsel demonstrates Wilmer Cutler's involvement in the case on Grass's behalf well before the February 2000 hearing.

**22.** In addition to the facts set forth below, we also observe that the fact that Ballard Spahr's ceased to represent Grass because of possible conflicts should naturally have alerted Grass and his counsel to the possibility of future adversity. Although Alan Davis testified that he did not specifically tell Wilmer Cutler that Rite Aid might have claims against Grass, we cannot see how such highly sophisticated counsel could have failed to understand the import of Grass's resignation based on the widespread media coverage of events at Rite Aid.

**23.** As discussed in the margin above at note 6, the absence of such a package is striking when compared to the lucrative package that Bergonzi received upon his departure from the position of Chief Financial Officer in June 1999.

**24.** Swidler, Berlin, Shereff, Friedman LLP.

**25.** In his letter to Rite Aid, Grass declined the interview on the advice of counsel. Rite Aid characterizes Grass's behavior as a refusal to cooperate with the investigation, while Grass maintains that he did cooperate by submitting the letter, and that the conditions attached to the interview were unfair in that the investigators refused to grant Grass access to docu-

or early 2000, when Wilmer Cutler explored with Ballard Spahr the issue of a joint defense agreement between Rite Aid and Grass, Ballard Spahr refused to enter into such an agreement; this, too, should further have alerted Grass to adversity between Rite Aid and him.

Taking these facts in the aggregate, we have no doubt that Grass was on notice of Rite Aid's adversity long before he received the announcement of the partial settlement between the plaintiffs and Rite Aid on November 9, 2000. In the circumstances of this case, this delay of at least nine months (and more like thirteen) in seeking to disqualify Ballard Spahr was undue and constituted waiver. Consequently, irrespective of the merits of Grass's contentions with respect to Ballard Spahr's conduct here, Grass waived his ability to seek Ballard Spahr's disqualification from continued representation of Rite Aid.

### C. Grass and Bergonzi's Objections to the Settlements Related to Ballard Spahr's Conduct

As noted at the outset, one of Grass and Bergonzi's objections[26] to the proposed settlements is that the agreements were the product of Ballard Spahr's alleged ethical breaches. As we have concluded here that no such breaches occurred, we overrule that objection.[27]

ments about which he would be questioned. Irrespective of whether Grass's refusal to appear for an interview on the conditions set by the investigators constituted a "refusal to cooperate", we note that the very fact that Rite Aid wished to interview Grass—about suspected wrongdoing that had occurred on his watch as CEO—under conditions he considered to be unfair further illustrated the adversity between Grass and Rite Aid. We also note in this regard that according to testimony we heard at the hearing, only three individuals refused to cooperate fully with the internal investigation, with Grass and Bergonzi constituting two of them.

### ORDER

AND NOW, this 17th day of April, 2001, upon consideration of defendant Martin Grass's motion to disqualify Ballard, Spahr, Andrews & Ingersoll (docket number 9 in MDL–1360), Rite Aid's response thereto, Grass's reply thereto, and Rite Aid's supplemental memorandum of law, and upon consideration of defendants Martin Grass and Frank Bergonzi's objections to the proposed class action and derivative settlements, and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. The motion to disqualify counsel is DENIED; and

2. Grass and Bergonzi's objection to the proposed settlements on the grounds that they are the result of continuing breaches of professional ethics by Rite Aid's counsel is OVERRULED.

**26.** Presented in section II(A) of Grass and Bergonzi's Objections to Proposed Partial Settlement.

**27.** This assumes that if the settlement had been the product of unethical behavior by counsel with respect to a non-settling defendant, it would constitute grounds to disapprove the settlement. It is by no means clear that this would in fact supply grounds for disapproval; however, given our findings here, we need not resolve this question.